```
 1                  UNITED STATES DISTRICT COURT

 2                       DISTRICT OF ARIZONA

 3   United States of America,     )
                                   )
 4              Plaintiff,         )  17-mj-1439-N/A-BPV
                                   )
 5        vs.                      )
                                   )  Tucson, Arizona
 6   Paul Douglas Adams,           )  February 14, 2017
                                   )  10:52 a.m.
 7   _____Defendant._____)

 8
                      TRANSCRIPT OF PROCEEDINGS
 9                 DETENTION/PRELIMINARY HEARING

10
              BEFORE THE HONORABLE D. THOMAS FERRARO
11                UNITED STATES MAGISTRATE JUDGE

12   APPEARANCES:

13   For the Plaintiff:
         Erica Seger
14       U.S. Attorney's Office
         405 West Congress Street, Suite 4800
15       Tucson, AZ 85701

16   For the Defendant:
         Jeffrey G. Buchella
17       Jeffrey G. Buchella
         177 N. Church Avenue, Suite 200
18       Tucson, AZ 85701

19


20


21   Transcribed by:
         Cindy J. Shearman
22       405 W. Congress Street, Suite 1500
         Tucson, AZ 85701
23       520-205-4286

24           Proceedings were digitally recorded
          Transcript prepared by transcriptionist
25
```

UNITED STATES DISTRICT COURT

```
1                    P R O C E E D I N G S
2        (Call to order of court, 10:52 a.m.)
3            CLERK:  In case 17-1439, Paul Douglas Adams, on for
4    detention and preliminary hearing.
5            MS. SEGER:  Good morning, Your Honor.  Erica Seger on
6    behalf of the United States.
7            MR. BUCHELLA:  Jeff Buchella, Your Honor, on behalf of
8    Mr. Adams.  I'd like the court to also take note of the fact
9    that Mr. Adams' brother, David Adams, and his wife, are here in
10   the courtroom.
11           THE COURT:  Okay.  Thank you.
12           MR. BUCHELLA:  And they're referenced in the pretrial
13   services report.
14           THE COURT:  How would you like to proceed as to the
15   preliminary hearing?
16           MR. BUCHELLA:  We're not requesting a preliminary
17   hearing.
18           THE COURT:  So you're waiving the right to a
19   preliminary hearing in exchange for early disclosure?
20           MR. BUCHELLA:  Yes.
21           THE COURT:  That will be the order of the court.
22      The defendant is bound over for trial pursuant to the
23   normal agreement.  The government shall provide early
24   disclosure.
25       With regard to the issue of release versus detention, is
```

```
 1  the government seeking detention?
 2          MS. SEGER:  Yes, Your Honor.
 3          THE COURT:  All right.
 4          MS. SEGER:  For all the reasons set forth in the
 5  pretrial services report.  This is a presumption case.  There's
 6  nothing in this report that overcomes that presumption.  We do
 7  believe that the defendant in this case is a danger to the
 8  community and a danger to even the children of his brother who
 9  I know that pretrial looked at as a possible third-party
10  custodian.
11     And, at this point, if the court is considering release, we
12  would ask for a detention hearing where we can present
13  testimony with regard to dangerousness.
14          THE COURT:  All right.
15     Mr. Buchella?
16          MR. BUCHELLA:  Your Honor, I'm asking the court to
17  release Mr. Adams today, setting appropriate conditions, the
18  sort of conditions that the court routinely sets in these
19  cases.
20          THE COURT:  Where would he live?
21          MR. BUCHELLA:  Well, the two options available either
22  are to go with his parents and, of course, pretrial services
23  references their communications with the parents.  I've also
24  spent a fair amount of time on the phone with the parents.
25  They're more than willing to take him in as third-party
```

1  custodians.  I think it's an entirely appropriate placement.
2       The -- and he can be supervised if not out of pretrial
3  services here in Tucson, I'm sure they can get the office in
4  San Diego or whatever the closest pretrial services office is
5  over there to supervise him.
6       They have a landline so if the court's inclined to have
7  conditions which include electronic monitoring and home arrest,
8  I mean, that can be accomplished there through his parents'
9  home.
10      He has a pretty close relationship with his parents and I
11  think they would like to have him there not just because they
12  would like to see him released, but also because he could be of
13  some assistance.  His mother does have some health problems but
14  that, I don't think, is particularly relevant.  It's actually
15  an opportunity for him to try to help out in that regard.  So I
16  think his parents would be a very good release option.
17      His brother and his family, I think, is a good release
18  option, too.  The fact that they have children in and of itself
19  I don't think should be an obstacle to release.  His brother's
20  wife is there whenever the brother is not there.  The brother's
21  there whenever he's not working.  So, I mean, I think they
22  could take third-party custody as well, and I don't think it
23  would necessarily be a problem.
24      I think there's a kind of illogical leap based on the
25  charges that somehow this is conduct, you know, that could

1  spill out into the community and affect other people or could
2  be repeated.  The complaint, as far as I recall, doesn't even
3  indicate when these incidents occurred.  But my understanding
4  is these incidents are fairly remote in time now.  So that, you
5  know, that's an issue as well.  If there's no indication of any
6  kind of recent misconduct along these lines --
7              THE COURT:  Well, my understanding of the case is that
8  the way in which these photographs were discovered required
9  some time to investigate and identify.  So the delay in the
10 time was probably more occasioned by the way it had to be
11 investigated first.  It was provided by a foreign government to
12 our government who had to then take information from and try to
13 detect who it was.  So there was a delay in that period of
14 time.
15     But I don't mean to cut you off, Mr. Buchella.  Feel free
16 to continue.
17              MR. BUCHELLA:  Well, and that's a valid point.  No
18 doubt that the investigation itself resulted in some delay
19 before the government could bring a charge.  But from the
20 complaint itself, I don't see any indication that the
21 underlying conduct is recent.  In other words, the images that
22 are discussed in the complaint, I think that's dated activity.
23 In other words, not because of the delay in the investigation
24 but perhaps because that's -- these are old events.
25     So that's just my point.  There's -- I don't think there's

1   any reason medically, scientifically, empirically to think that
2   just because these incidents occurred in the past that somehow
3   that means that he creates or he poses some sort of immediate
4   risk to everybody that comes around him, particularly if he's
5   going to be supervised by two adults.  With respect to his
6   parents, of course, we don't have that issue.
7       So I think both of those release options are appropriate.
8   And I think the case law is that the district court has broad
9   discretion to make release determinations.  There are certain
10  conditions that are routinely imposed in these kinds of cases
11  which further protect the government's interest in terms of his
12  nonappearance or whatever risk he might pose to the surrounding
13  community.
14      What's interesting to me about pretrial services' report
15  and investigation is that really the charges themselves are
16  kind of a in the background sort of unspoken thing that's
17  driving pretrial services' recommendation and probably driving
18  the government's recommendation, too.  If you subtract the
19  nature of the charges themselves, you've got a pretrial
20  services report which is fairly routine and actually typifies
21  the defendant that is commonly released in this court.
22          THE COURT:  Right.
23      Let me ask the government, what facts am I to rely upon?
24  As Mr. Buchella points out, the facts in this case are only
25  skeletally described in the complaint.  And you started out,

1  you indicated that you were offering to have testimony.  Is
2  that what you want to do or you just want me to rely on the
3  facts of the complaint or you want to make a proffer and see if
4  Mr. Buchella agrees with the proffer?
5             MS. SEGER:  Your Honor, I'm 100 percent happy to make
6  a proffer.  And in doing that, I'd note first that this is a
7  production of child pornography case.  The victim in the
8  nine-minute video that we have charged is the defendant's
9  daughter, his older daughter.  He also admitted to molesting
10 his younger daughter, who is approximately two years old at
11 this point.  The video was taken in June of 2015 based on the
12 metadata that we were able to recover through the facts set out
13 in the complaint.  But the defendant admitted to having
14 molested his daughter for the past approximately seven years on
15 multiple occasions.
16    We understand that we're going to be able to find multiple
17 videos in the forensic examination that's done on the
18 defendant's cell phone and the other electronics that were
19 seized from his house.
20    We also understand, based on what the defendant said in his
21 interview, that he has been looking at child pornography for
22 approximately ten years, and that he described it himself as
23 something that he could not stop doing.
24    I also understand that the defendant's older daughter
25 during her forensic interview last week acknowledged that she

1  had, in fact, been molested by her father.  We were able to
2  identify the location where this took place as being his
3  residence in Bisbee by the video itself, the nightgown that the
4  little girl was wearing in the video, the sheets, the bedding,
5  all of that is all part of the video that was taken in June of
6  2015.
7           THE COURT:  Is the perpetrator's face depicted on the
8  video?
9           MS. SEGER:  Yes, it is.  And it's been identified as
10 the defendant.  He acknowledged that he, in fact, created that
11 video, and the little girl identified her dad as being the
12 person depicted in the video.
13    Again, this is all based on the defendant's statements and
14 our preliminary investigation but we anticipate that there's
15 going to be multiple production of child pornography charges
16 when this case makes it to grand jury and also some possession
17 and distribution of child pornography charges separate and
18 apart from the production.  So --
19          THE COURT:  When was the government, that is, the US
20 Attorney's Office, first aware of these events?
21          MS. SEGER:  February 7th, 2017.
22          THE COURT:  So you moved as quickly as possible?
23          MS. SEGER:  Yes.
24          THE COURT:  I take it you're still currently
25 investigating and that's why you don't have everything?

1    MS. SEGER: Correct. There was a search warrant
2 executed at the same time the defendant was interviewed and
3 arrested. I believe that was last Wednesday, if I remember
4 correctly.
5    THE COURT: That was the date that the government
6 discovered this?
7    MS. SEGER: We learned late Tuesday night, we were
8 alerted to it -- all this. The defendant's arrest and the
9 search took place on Wednesday. We obviously -- the forensic
10 interviews of the little girl were on Thursday as well as the
11 defendant's other four children; the youngest child was unable
12 to be interviewed.
13     I'd also note that the defendant's wife was interviewed
14 when the search warrant was executed and she provided some
15 information but also indicated that the defendant has a recent
16 sexual relationship with his mother, which again I will bring
17 to the court's attention because I think that goes to her
18 eligibility or whether or not she should be considered as a
19 third-party custodian.
20     So I don't think there's anything, just based on the
21 government's position in this case, that establishes that the
22 defendant has overcome the presumption or that he is not a
23 continuing danger to the community based on his words that he
24 used when he was interviewed last week.
25    THE COURT: All right.

1         Mr. Buchella?

2              MR. BUCHELLA:  Well, Your Honor, I'm not privy, of
3    course, to any details of the investigation.  I don't hear
4    anything that dates any particular misconduct to a date that's
5    recent to this date other than if there is possession, of
6    course, possession, I mean, once it's on a computer, it's on a
7    computer.

8              THE COURT:  I would note that according to the
9    government's proffer, the defendant is alleged to have told the
10   agents during the interview that he can't stop.  And that was
11   as recent as the interview earlier last week.

12             MR. BUCHELLA:  Right.

13             THE COURT:  So, I mean, do you have a counter proffer
14   you want to make?

15             MR. BUCHELLA:  Well, the issue there would be -- I
16   don't know what the defendant said or not, you know.  He's
17   indicating to me right now that he disputes some of the
18   allegations that are made about what he said but --

19             THE COURT:  So why don't I do this --

20             MR. BUCHELLA:  I'm sorry.  I didn't mean to interrupt.

21             THE COURT:  No, you go right ahead.  I don't want to
22   interrupt you.

23             MR. BUCHELLA:  What I was going to say is if he has
24   trouble, you know, controlling his search activities on a
25   computer, the standard sort of Adam Walsh condition is that he

1  not have access to computers.  And compliance with that is
2  relatively simple in terms of wherever placement he goes to,
3  that these computers either be password protected or otherwise
4  rendered useless for the defendant -- defendant's purposes.
5  And that's relatively easy.
6      Pretrial services can ensure, for example, that the parents
7  password protect, I believe they have two devices.  I believe
8  they have an iPad and a laptop and I forget, but that's -- they
9  have one internet carrier.  So I think they can password
10 protect that and then the defendant has no access to internet
11 activity and, therefore, there's really -- there's no concern
12 in terms of him being compulsive around internet searches.
13      And the same thing, actually, would go for his brother's
14 home.  I mean, you can password protect those devices to ensure
15 that he doesn't have any access to them.
16          THE COURT:  So let me tell you what I'm going to do.
17 I'm going to rely on the government's proffer, and I understand
18 that the nature of the charge creates a presumption.  For the
19 reasons described by the government, I'm going to order that
20 the defendant be detained.  I don't think there's any condition
21 or combination of conditions I could set that would reasonably
22 ensure the future -- excuse me, that would assure the
23 community.  This defendant should be detained based on the
24 facts alleged in the proffer.
25      Mr. Buchella, in the course of discovery and when you have

1  time to investigate, if you find that the government's proffer
2  is wrong in any material way, I think you should have the
3  opportunity to reopen the issue of detention because I'm
4  relying on that proffer.
5      Now, I say any material way because at this point in a case
6  that the prosecutor just learned about a week ago, they
7  probably know less about the case than they'll know in three
8  weeks.  So, I mean, little issues here and there I'm not so
9  concerned about.  But if there's a material inaccuracy, and I'm
10 not suggesting they're doing anything inappropriate, they just
11 don't know enough about it perhaps right now.  But I'm relying
12 on that proffer.  I think the proffer establishes that the
13 defendant should in no way be released; he should be detained
14 pending the outcome of this case.  And the penalties on this
15 are going to be really high.  I mean, it's just -- he just
16 shouldn't be out.  He's a danger to himself as well.  I mean,
17 you heard this from the facts alleged, this guy should be
18 detained.
19     So if that turns out to be wrong, you can reopen and we'll
20 -- I don't know if it will be me.  I think it's Judge Velasco
21 that's assigned the case and he'll reconsider it, all right?
22 Thank you.
23          MR. BUCHELLA:  Thank you, Your Honor.  And, could I
24 ask the court to make a recommendation to the marshals service
25 that the defendant does have ongoing medication for

1  depression --

2          THE COURT:  Right.  So what you need to do, sir, is
3  when you go to this facility that you've been in, you need to
4  fill out a form requesting to be seen by a doctor.  You just
5  have to keep filling that out every day.  They're supposed to
6  see you within 48 hours.  It's a big place.  And, you know,
7  just sometimes it takes a little bit of time.
8      But, marshal, they requested that he be seen by a doctor
9  because he does have depression.  Probably be a good idea
10 because he probably will need it, all right?  All right.
11         THE DEFENDANT:  Thank you for your consideration, Your
12 Honor.
13         THE COURT:  All right.  Good luck to you, sir.
14     (Whereupon, the matter was concluded at 11:08 a.m.)

C E R T I F I C A T E

1
2
3
4       I, Cindy J. Shearman, court-approved transcriber,
5  certify that the foregoing is a correct transcript from the
6  official digital sound recording of the proceedings in the
7  above-entitled matter to the best of my ability.
8
9
10    s/Cindy J. Shearman                         March 15, 2017
    Cindy J. Shearman, RDR, CRR
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25